1 | MARTIN D. SINGER (BAR NO. 78166)
2 | ALLISON HART SIEVERS (BAR NO. 190409)
  | LAVELY & SINGER
3 | PROFESSIONAL CORPORATION
  | 2049 Century Park East, Suite 2400
4 | Los Angeles, California  90067-2906
  | Telephone: (310) 556-3501
5 | Facsimile: (310) 556-3615
  | Email: mdsinger@lavelysinger.com
  |           asievers@lavelysinger.com

7 | Attorneys for Plaintiffs WAYNE JACOBSEN
  | and BRAD CUMMINGS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| WAYNE JACOBSEN, an individual; BRAD CUMMINGS, an individual, | CASE NO. CV 10-3246 JFW (JCx) |
|---|---|
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR:** |
| v. | **(1)  DECLARATORY RELIEF UNDER 17 U.S.C. §§ 101, _ET SEQ._; AND** |
| WILLIAM PAUL YOUNG, an individual; and DOES 1–10, inclusive, | |
| Defendants. | **(2)  BREACH OF CONTRACT** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Wayne Jacobsen and Brad Cummings (collectively "Plaintiffs") allege as follows:

### JURISDICTION & VENUE

1.      This action is brought and jurisdiction lies within this Court pursuant to 28 U.S.C. section 1331, in that it arises under the United States Copyright Act of 1976, 28 U.S.C. sections 101, _et seq._, and the Declaratory Judgment Act, 28 U.S.C. sections 2201, _et seq._  Jurisdiction also lies within this Court pursuant to 28

FAC (D) 062210.wpd

1

1  U.S.C. section 1332, in that the amount in controversy exceeds $75,000.00 and it

2  is between citizens of different states.  Venue lies within and is proper in this

3  District and Court pursuant to 28 U.S.C. sections 1391 and 1392 because a

4  substantial part of the events, acts or omissions giving rise to the claims herein

5  occurred in the County of Ventura, State of California.

6

7  <u>**THE PARTIES**</u>

8      2.    Plaintiff Wayne Jacobsen ("Jacobsen") is, and at all times relevant

9  hereto was, an individual and a citizen of the State of California, residing in the

10  County of Ventura.

11      3.    Plaintiff Brad Cummings ("Cummings") is, and at all times relevant

12  hereto was, an individual and a citizen of the State of California, residing in the

13  County of Ventura.

14      4.    Plaintiffs are informed and believe and based thereon allege that

15  Defendant William Paul Young ("Young") is, and at all relevant times hereto was,

16  an individual and a citizen of the State of Oregon, doing business in the County of

17  Ventura, State of California.

18      5.    Plaintiffs are informed and believe and based thereon allege that the

19  fictitiously named Defendants sued herein as Does 1 through 10, inclusive, and each

20  of them, were in some manner responsible or legally liable for the actions, events,

21  transactions and occurrences alleged herein.  The true names and capacities of such

22  fictitiously named Defendants whether individual, corporate, associate or otherwise,

23  are presently unknown to Plaintiffs, and they will seek leave of Court to amend this

24  Complaint to assert the true names and capacities of such fictitiously named

25  Defendants when the same have been ascertained.  For convenience, each reference

26  to Young herein shall also refer, jointly and severally, to Does 1 through 10, and

27  each of them.

28  / / /

## ALLEGATIONS COMMON TO ALL CLAIMS

6.    Jacobsen and Cummings are both former pastors, authors and counselors who for several years have produced a regular podcast called *The God Journey*.

7.    In December 2005, Young sent Jacobsen a copy of an unpublished Christian manuscript he had written (hereinafter "Unpublished Manuscript"). Young informed Jacobsen that he had written the Unpublished Manuscript as a gift for his family, and he thought that Jacobsen might also enjoy it since it expressed themes similar to those in Jacobsen's published works.

8.    The Unpublished Manuscript, as written by Young, was cumbersome, laden with agenda, and devoid of a clear storyline.  Nevertheless, Jacobsen believed that the Unpublished Manuscript had potential, and if rewritten, might be a work worth sharing with a larger audience.  Therefore, after reading Young's first draft, Jacobsen attempted to convince Young to rewrite the Unpublished Manuscript. Jacobsen suggested numerous changes which Jacobsen believed would improve the quality of the manuscript and make it more marketable.  However, Young insisted to Jacobsen that he did not have the passion to rewrite the Unpublished Manuscript, and begged Jacobsen to assist him with rewriting it.

9.    In March 2006, Jacobsen, Cummings and Bobby Downes ("Downes") met with Young at Jacobsen's home.  During that meeting, they discussed the process of publishing a book and the possibility of producing a motion picture based on the Unpublished Manuscript.  At that meeting, Jacobsen and Cummings agreed to collaborate with Young and work with him to rewrite the Unpublished Manuscript.  Jacobsen, Cummings, Young and Downes further agreed that once rewritten, the four of them would collaborate to produce a motion picture based on the rewritten manuscript.

10.    Jacobsen and Cummings recommended that multiple changes be made to the Unpublished Manuscript.    After Young's first attempt to rewrite the

1  Unpublished Manuscript, it was clear that Young lacked the ability to make the

2  significant changes to the story recommended by Jacobsen and Cummings.

3  Accordingly, Jacobsen rewrote a chapter as an example for Young of the changes

4  he was recommending. Young loved the chapter Jacobsen had written and

5  requested that he do more.

6        11. Thereafter, Jacobsen, Cummings and Young worked extensively on the

7  Unpublished Manuscript, rearranging dialog, adding new plot points and new

8  dialog. On most every point, Young expressed his pleasure with the written

9  changes Jacobsen and Cummings had made to the Unpublished Manuscript.

10        12. Over the next eleven months, Jacobsen, Cummings and Young

11  continued to rewrite the Unpublished Manuscript – including four major rewrites in

12  which new insights, plot points and dialogue were added to make the story more

13  compelling. As a result of the co-writing collaboration between Jacobsen,

14  Cummings and Young, the Unpublished Manuscript was transformed from an un-

15  publishable work into the novel ultimately entitled *The Shack* (hereinafter the

16  "Book").

17        13. Jacobsen contacted a number of people he knew in the publishing

18  industry, to attempt to find a publisher to publish the Book. When no publisher was

19  interested in publishing the Book, it was agreed by Young, Jacobsen and Cummings

20  that Jacobsen and Cummings would form a publishing company to publish the Book

21  and new works by Jacobsen and Cummings. Accordingly, in 2007, Jacobsen and

22  Cummings formed Windblown Media, Inc. ("Windblown"), a small Christian

23  publishing house, for the purpose of publishing the Book and new works they

24  intended to pursue

25        14. In 2007, Windblown and Young entered into an oral publishing

26  agreement in which they agreed that Windblown would publish the Book pursuant

27  to the following terms: Young would receive a \$.50 per paperback/\$1.00 per

28  hardback royalty for each copy of the Book sold, along with one-third (⅓) of the

profits set aside for the co-authors fo the Book.  Specifically, the parties agreed that Windblown would set aside fifty percent (50%) of the revenue received in connection with the Book for profits to be shared equally among the co-authors of the Book, with Young, Jacobsen and Cummings each receiving one-third (⅓) of those profits.  The reason that Jacobsen, Cummings and Young agreed to divide the profits from the Book in this manner is because they agreed that it reflected the collaboration of Young, Jacobsen and Cummings as co-authors of the Book.  The remaining fifty percent (50%) of the revenue received from the exploitation of the Book was set aside for Windblown's operating capital, and of that amount, ten percent (10%) would be paid as a fee to Windblown for overhead, twenty percent (20%) would be paid as a distribution fee to Windblown, and twenty percent (20%) would be used to cover production and printing/manufacturing costs and marketing expenses. Jacobsen, Cummings and Young agreed that they would operate pursuant to the foregoing oral publishing agreement and reassess the foregoing percentages from time to time and readjust them if necessary.

15.   As Windblown prepared to publish the Book, Jacobsen and Young discussed the fact that Jacobsen's and Cummings' contributions to the Book far exceeded any contributions that an editor would make.  Because Jacobsen and Cummings had jointly co-authored the Book with Young, Jacobsen discussed with Young that he and Cummings should be identified as joint authors on the cover of the Book and the copyright registration.  Young agreed that Jacobsen and Cummings had co-authored and were joint owners of the copyright to the Book, and he acknowledged that they had made substantial contributions as co-authors of the Book.

16.   Specifically, Young, Jacobsen and Cummings discussed and agreed that their collaboration in rewriting Young's original manuscript represented 60% of the Book, that Young, Jacobsen and Cummings had each contributed equally in their collaboration in rewriting the Book, and that Young's original manuscript

1    represented 40% of the Book. Accordingly, when Windblown subsequently entered

2    into a written publishing agreement with Young, Young, Jacobsen and Cummings

3    expressly agreed that the "author's share" of certain royalties would be divided 60%

4    to Young (40% for the original manuscript plus 20% for his share of the

5    collaboration on the rewrite), 20% to Jacobsen and 20% to Cummings.

6         17.    Young further agreed that, as co-authors of the Book and in recognition

7    of their substantial contributions to the Book, Jacobsen and Cummings would have

8    the lead responsibility to develop a screenplay and produce a motion picture based

9    on the Book.

10        18.    Notwithstanding the fact that Young, Jacobsen and Cummings each

11    agreed that they jointly collaborated in authoring the Book, Young told Jacobsen and

12    Cummings that because he had written the original manuscript on which the Book

13    was based as a gift for his family, it was very important to him and his family that

14    he be identified as the lead author of the Book on its cover and in the copyright

15    registration. Therefore, although Young acknowledged and agreed that Jacobsen

16    and Cummings had co-authored the Book and were co-owners of the copyright,

17    Young requested that he be identified as the lead author of the Book on its cover,

18    and be identified as the author in the copyright registration.

19        19.    Jacobsen and Cummings informed Young that they would consent to

20    his request that he be identified as the lead author of the Book on its cover and in

21    the copyright registration, provided that Young honor the parties' agreements that

22    Jacobsen, Cummings and Young were co-authors and co-owners of the copyright,

23    and that Jacobsen and Cummings would be compensated and receive lead billing as

24    the developers of the screenplay and the producers of the motion picture based on

25    the Book.

26        20.    Accordingly, Jacobsen, Cummings and Young orally agreed that Young

27    would be identified as the lead author of the Book on its cover and in the copyright

28    registration, on condition that Young would (a) acknowledge the rights of Jacobsen

1    and Cummings as co-authors and co-owners of the copyright of the Book; (b) treat

2    the Book as a joint work co-authored and co-owned by Young, Jacobsen and

3    Cummings; (c) Windblown would remain the publisher of the Book for the full term

4    of the copyright; (d) Jacobsen and Cummings would each have the right to receive

5    one-third of the profits from general sales of the Book (after payment of Young's

6    per book royalty and Windblown's expenses); and (e) Young would assign the

7    motion picture rights for the Book to an entity jointly owned and controlled by

8    Jacobsen, Cummings, Young and Downes so that they could produce a motion

9    picture based on the Book.  Based on the foregoing, on May 11, 2007, on behalf of

10   Windblown, Cummings submitted a copyright registration to the United States

11   Copyright Office, Copyright No. TX0006578498, which identified Young as the

12   author of the Book.

13        21.    In February 2008, several months following the publication of the Book

14   by Windblown, after a discussion between Young, Jacobsen and Cummings about

15   how the publicity for the Book was undermining its message and how they might

16   refocus readers' attention on the message of the Book, Young announced to a group

17   of approximately 60 or 70 people in a home in Haymarket, Virginia, that he felt

18   disingenuous about his designation as the sole author of the Book based on the

19   substantial contributions by Jacobsen and Cummings to the Book.  Young announced

20   that, effective immediately, he wanted to add Jacobsen and Cummings' names to the

21   cover of the Book as its co-authors, as should have been done from the first

22   publication of the Book.   However, when Young subsequently shared this

23   announcement with his family, Young's wife expressed extreme anguish over the

24   change and pressured Young not to change the cover page of the Book.

25        22.    Accordingly, following the meeting in Haymarket, Virginia, Jacobsen,

26   Cummings and Young agreed to change the title page of the Book to give authorship

27   credit to Jacobsen and Cummings, such that it now states that Young wrote it "in

28   collaboration with Wayne Jacobsen and Brad Cummings."  In the Acknowledgments

FAC (D) 062210.wpd

1    of the Book, Young has also admitted that, "[Wayne] and Brad bore the lion's share

2    of work in the three major rewrites of the book . . ."

3         23.    The Book was released by Windblown in May 2007.  Although the

4    Book was initially sold only on a website and was not available in book stores, it

5    became an instant hit.   As sales of the Book approached one million copies,

6    Windblown struggled to keep up with the demand.  During this time, a literary agent

7    approached Jacobsen, Cummings and Young and suggested that they pursue offers

8    from larger publishing houses in New York to provide fulfillment services for the

9    Book (i.e., assist with production, printing and distribution).  Young, Jacobsen and

10   Cummings agreed that Windblown should seek a larger publishing house with the

11   ability to provide fulfillment services to meet the overwhelming demand for the

12   Book.

13        24.    Before entering into an agreement with a third party fulfillment service

14   provider, Jacobsen, Cummings and Young agreed that Windblown and Young

15   should enter into a written publishing agreement.   Neither Young nor Windblown,

16   nor Windblown's principals, Jacobsen and Cummings, were represented by counsel.

17   Young, on the one hand, and Jacobsen on behalf of Windblown, on the other hand,

18   negotiated and jointly drafted a written publishing agreement, based on a form

19   contract provided to them by Hachette (hereinafter "Windblown-Young

20   Agreement").   A true and correct copy of the Windblown-Young Agreement is

21   attached hereto as Exhibit "A."

22        25.    At the same time Young, Jacobsen and Cummings drafted and

23   negotiated the Windblown-Young Agreement, they also entered into a written Letter

24   of Understanding, pursuant to which they agreed that the motion picture rights to

25   the Book would be assigned to a limited liability company to be formed by Young,

26   Jacobsen, Cummings and Downes for the purpose of producing a motion picture

27   based on the Book.  Although Young acknowledged and agreed that Jacobsen and

28   Cummings were co-authors of the Book and co-owners of the copyright, Young

1  indicated that it was important to him to be the signatory of the agreement

2  transferring the motion picture rights to the limited liability company.  Because

3  Young had agreed to transfer the rights to a company owned and controlled by

4  Young, Jacobsen, Cummings and Downes, Jacobsen and Cummings did not object

5  to Young's request that he be the signatory of a literary purchase agreement

6  transferring the motion picture rights to the Book.  A true and correct copy of the

7  Letter of Understanding is attached hereto as Exhibit "B."   Although the

8  Windblown-Young Agreement is dated May 10, 2008, and the Letter of

9  Understanding is dated May 1, 2008, the two agreements were negotiated, submitted

10  for execution and executed by the parties simultaneously.

11       26.   Consistent with the parties' agreement to jointly develop a motion

12  picture based on the Book, the Letter of Understanding provides that in the event

13  the motion picture rights are sold before a limited liability company is formed for

14  the purpose of exploiting those rights, the receipts shall be divided evenly between

15  Young, Jacobsen, Cummings and Downes.  Similarly, consistent with the parties'

16  agreement that Young, Jacobsen and Cummings were co-authors of the Book and

17  co-owners of the copyright to the Book, the Windblown-Young Agreement provides

18  that any consideration payable to the author of the Book in connection with the

19  exploitation of the motion picture rights shall be divided 60% to Young, 20% to

20  Cummings and 20% to Jacobsen, pursuant to their respective contributions to the

21  Book..

22       27.   Thereafter, on May 22, 2008, Young, Jacobsen, Cummings and

23  Downes formed The Shack Movie, LLC, a California limited liability company

24  formed, pursuant to the Letter of Understanding, for the purpose of producing a

25  motion picture based on the Book.[1]

26

27      [1]   Although Downes was initially a member of The Shack Movie, LLC
and is identified as a party to the Letter of Understanding, Mr. Downes never

28  executed the Letter of Understanding and he resigned and withdrew from The
Shack Movie, LLC as of November 12, 2008.

28.   The Windblown-Young Agreement expanded the oral agreement previously entered into between Young and Windblown, in that it provides that Young will receive a $.50 per paperback/$1.00 per hardback royalty for each copy of the Book sold in the United States, along with one-third of the net profits received by Windblown for sales of the Book.  In addition, the parties agreed to the following additional terms:

(a)   After engaging in lengthy discussions about the respective contributions of Young, Jacobsen and Cummings to the final draft of the Book, the parties agreed that for foreign sales of the Book and certain other products, the royalty rate would be divided 60% to Young, 20% to Jacobsen and 20% to Cummings.   The parties agreed that these percentages reflected the parties' respective contributions to the Book, namely that Young's original manuscript was worth 40%, and that 60% of the book represented the collaboration and joint authorship of Young, Jacobsen and Cummings, which would be divided equally. Thus, Young would receive 60% (40% + 20%), and Jacobsen and Cummings would each receive 20%.

(b)   Windblown would have the merchandising rights to the Book, and Young would receive a royalty of 10% of the net sales revenue received by Windblown in connection with such merchandising.

(c)   Windblown would have the right to manufacture and sell educational materials, calendars, posters and merchandise based on the Book.

(d)   At the time the Windblown-Young Agreement was entered into, with Young's full knowledge and approval, Jacobsen and Cummings were already well into the development and production of a motion picture based on the Book. The parties agreed that under the Windblown-Young Agreement, Young would be the signatory of any agreement disposing of the motion picture rights and that he would act in concert with Windblown in the disposition of those rights. In recognition of the respective contributions of Young, Jacobsen and Cummings as co-

authors of the Book, any consideration received by as a result of the assignment of the motion picture rights to The Shack Movie, LLC would be divided 60% to Young, 20% to Jacobsen and 20% to Cummings.   Pursuant to the Letter of Understanding executed between Young, Jacobsen and Cummings, Young concurrently agreed to assign the motion picture rights to the Book to The Shack Movie, LLC.

29.   During this time, Jacobsen, Cummings and Young also discussed the fact that, if Windblown entered into a contract with a third party to provide fulfillment services for the Book, Windblown would be giving up the lion's share of its sales and distribution revenue and, in order for Windblown to continue operating and to grow as a publishing company, it could not pay one hundred percent (100%) of its profits to its authors.  Therefore, Jacobsen, Cummings and Young orally agreed that, after deduction of the agreed upon royalties paid to Young and other publication expenses, Windblown would receive twenty-five percent (25%) of the resulting profits, and Young, Jacobsen and Cummings would divide the remainder of the profits one-third (⅓) each to Young, Jacobsen and Cummings, the co-authors of the Book.  This profit sharing provision in the Windblown-Young Agreement is far more generous than is typical in the publishing industry, where the industry norm would be to pay an author of Young's caliber 7.5% of the Suggested Retail Price of the book.  In contrast, Young is earning an effective royalty rate in excess of 9.5% for a book that he claimed to have contributed only 60% to its writing.   Windblown is setting aside over 75% of the monies it receives in connection with the Book, with Young, a previously unknown and unpublished author, who was not the sole author of the Book, receiving one-third (⅓) of that amount.

30.   Young was actively involved in, collaborated with and approved Windblown's decision to seek a third party to provide fulfillment services in order to keep up with the demand and growing distribution for the Book.

31.  In April and May 2008, Windblown entered into negotiations with Hachette Book Group, Inc. ("Hachette") to provide fulfillment services for the Book.  Young was actively involved in and approved Windblown's decision to enter into a contract with Hachette to provide fulfillment services for the Book, realizing that they would all be giving up one half of the profits from the Book.

32.  Indeed, prior to Windblown entering into a contract with Hachette, Jacobsen, Cummings and Young discussed the matter at length, including the fact that under the Windblown-Young Agreement, without Hachette's involvement in the publication of the Book, Young and Jacobsen and Cummings (through Windblown) each received one-third (1/3) of the profits from the Book, but if Windblown contracted with Hachette to provide fulfillment services for the Book, Young, Jacobsen and Cummings would instead each receive one-sixth (1/6) of the profits from the Book, with the upside being that there would be a higher volume of sales and the Book would reach a much larger audience.  Young agreed that with respect to the profits generated for Windblown out of the money received from Hachette, Young and Jacobsen and Cummings would continue to share in the profits from the Book equally, except for certain limited exceptions set forth in the Windblown-Young Agreement, including without limitation "high discount sales" of the Book, for which Young receives 10% of the net sales revenue for hardcover editions and 5% of the net sales revenue for all other editions.

33.  Accordingly, as of May 13, 2008, Windblown entered into a written agreement with Hachette for Hachette to provide fulfillment services for the Book, and certain other titles (hereinafter the Hachette-Windblown Agreement).  A true and correct copy of the Hachette-Windblown Agreement (excluding certain sensitive financial information which has been redacted) is attached hereto as Exhibit "C."

34.  The decision for Windblown to contract with Hachette to provide fulfillment services for the Book proved to be enormously lucrative for Young.  After Windblown entered into the Hachette-Windblown Agreement, the Book made

1  it to *The New York Times* bestseller list, where it has remained for almost 100

2  consecutive weeks.  There are currently over 12 million copies of the Book in print.

3  To date, Young, a previously unknown and unpublished author, has personally

4  received well in excess of $10.7 million in royalties and profits from the Book, in

5  addition to substantial additional monies he has received from speaking engagements

6  and other opportunities he has been offered as a result of the publication and

7  tremendous success of the Book.

8       35.  Notwithstanding the enormous financial rewards that Young has

9  received as a direct result of Jacobsen's and Cummings' collaboration on the Book

10  and Windblown's publication of the Book, Young has now repudiated his

11  contractual obligations to Jacobsen, Cummings and Windblown.

12       36.  For six months after the Windblown-Young Agreement and the Letter

13  of Understanding were signed, Young repeatedly acknowledged and confirmed that

14  the Letter of Understanding would control and be the operative agreement

15  concerning the disposition of the motion picture rights to the Book.  Between May

16  and November of 2008, Young repeatedly acknowledged his obligation to assign the

17  motion picture rights to the Book to The Shack Movie, LLC, and assured Jacobsen

18  and Cummings that he would do so.  During that time period, with Young's full

19  knowledge and consent, Cummings and Jacobsen actively worked to develop a

20  motion picture project based on the Book.  Young also authorized Cummings to

21  engage a director, and to enter into negotiations with the agents representing a

22  screenwriter who Jacobsen and Cummings wanted to hire to direct a motion picture

23  based on the Book.  As of approximately November 2008, Young assured Jacobsen

24  and Cummings that he would sign a literary option and purchase agreement,

25  assigning the motion picture rights to the Book to The Shack Movie, LLC.

26       37.  However, in breach of his obligations to Jacobsen and Cummings under

27  the Letter of Understanding, Young subsequently refused to execute a literary option

28  and purchase agreement with The Shack Movie, LLC for the motion picture rights

1   in the Book.  In addition, Jacobsen and Cummings are informed and believe and

2   based thereon allege that Young has been secretly negotiating with one or more third

3   parties to exploit the motion picture rights to the Book.

4        38.   Based on Young's absolute refusal to assign the motion picture rights

5   to the Book to The Shack Movie, LLC, and the fact that he has engaged in

6   surreptitious negotiations with third parties to dispose of the motion picture rights

7   to the exclusion of Jacobsen, Cummings, Plaintiffs are informed and believe and

8   based thereon allege that Young no longer intends to grant the motion picture rights

9   to an entity jointly owned and controlled by Young, Jacobsen and Cummings.

10   Instead, Young is taking  full credit for Jacobsen's and Cummings' substantial

11   contributions to the Book.

12        39.   In addition, contrary to Young's prior representation that if Jacobsen

13   and Cummings would consent to having the copyright to the Book registered in his

14   name alone Windblown would be the publisher of the Book for the full term of the

15   copyright and Jacobsen and Cummings, as co-authors, would each receive one-third

16   of the profits from general sales of the Book (after payment of Young's per book

17   royalty and Windblown's expenses), now that the Book is a financial success,

18   Young is seeking to terminate the Windblown-Young Agreement, so that

19   Windblown, Jacobsen and Cummings will be completely cut out of any profits from

20   future sales of the Book.

21        40.   Had Jacobsen and Cummings known at the time the copyright to the

22   Book was registered that Young would repudiate his agreement to grant the motion

23   picture rights to an entity jointly owned and controlled by Young, Jacobsen and

24   Cummings, and that Young would seek to terminate his publishing agreement with

25   Windblown in order to prevent Jacobsen and Cummings from receiving their share

26   of the Book's profits, Jacobsen and Cummings never would have agreed to register

27   the copyright in Young's name only.

28        41.   Accordingly, because Jacobsen's and Cummings' names were omitted

1  from the original copyright registration as a result of Young's agreement to the
2  foregoing, and Young has now repudiated that agreement, on March 11, 2010,
3  Jacobsen and Cummings filed a supplementary registration with the United States
4  Copyright Office, identifying Jacobsen and Cummings as co-authors of the Book.
5  A true and correct copy of the Supplementary Registration filed with the United
6  States Copyright Office in connection with the Book is attached hereto as Exhibit
7  "D."

8

9  ### FIRST CLAIM FOR RELIEF

10  **(By Plaintiffs For Declaratory Relief Against all Defendants)**

11      42.   Plaintiffs repeat, reallege and incorporate by reference each and every
12  allegation contained in Paragraphs 1 through 41, inclusive, as though fully set forth
13  herein.

14      43.   An actual and justiciable controversy has arisen and now exists among
15  the parties relating to their legal rights and duties under the United States Copyright
16  Act of 1976, 17 U.S.C. Sections 101 *et seq.*, for which Plaintiffs desire a
17  declaration of rights.  Resolution of this controversy turns exclusively on substantial
18  questions of federal copyright law.

19      44.   A declaratory judgment is necessary in that Plaintiffs contend and
20  Young denies that the Book is a "joint work" within the meaning of 17 U.S.C.
21  section 101, of which Jacobsen, Cummings and Young are all authors.  A judicial
22  declaration is thus necessary and appropriate at this time so that the parties can
23  ascertain their rights and duties with respect to the Book.

24      45.   Plaintiffs are suffering and will continue to suffer an injury-in-fact as
25  a result of Young's conduct.  This injury cannot be redressed without a judicial
26  declaration of the parties' rights and obligations in this matter.

27  / / /

28  / / /

## SECOND CLAIM FOR RELIEF

### (By Plaintiffs For Breach of Contract Against All Defendants)

46.     Plaintiffs repeat, reallege and incorporates by reference each and every allegation and denial contained in Paragraphs 1 through 41, inclusive, as though fully set forth herein.

47.     Young has materially breached the Letter of Understanding by refusing to enter into a literary option and purchase agreement with The Shack Movie, LLC for the motion picture rights in the Book.

48.     Plaintiffs have performed all conditions, covenants and promises under the Letter of Understanding to be performed on their part.

49.     As a direct and proximate result of the material breach of the Letter of Understanding by Young, Plaintiffs have been damaged in an amount that is not yet fully ascertainable, but which is believed to be in excess of Five Million Dollars ($5,000,000.00), together with accrued interest thereon at the legal rate.   When Plaintiffs have ascertained the full amount of those damages, they will seek leave of Court to amend this Complaint accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

ON THE FIRST CLAIM FOR RELIEF:

1.     For a judicial declaration by the Court that the Book is a "joint work" within the meaning of 17 U.S.C. section 101, and that Jacobsen, Cummings and Young are each co-authors of the Book;

2.     For an award of reasonable attorneys' fees and costs pursuant to 17 U.S.C. section 505;

/ / /

/ / /

FAC (D) 062210.wpd

16

**ON THE SECOND CLAIM FOR RELIEF:**

3.    For compensatory damages in excess of Five Million Dollars ($5,000,000.00), according to proof at the time of trial, together with interest at the maximum legal rate;

**ON ALL CLAIMS:**

4.    For costs of suit incurred in connection with this action; and

5.    For such other and further relief as the Court deems proper.

DATE: June 22, 2010

LAVELY & SINGER
PROFESSIONAL CORPORATION
MARTIN D. SINGER
ALLISON HART SIEVERS

By:_____
     MARTIN D. SINGER
Attorneys for Plaintiffs WAYNE
JACOBSEN and BRAD
CUMMINGS

1

## JURY DEMAND

2

3      Plaintiffs Wayne Jacobsen and Brad Cummings hereby demand a trial by jury

4 in this action.

5

6 DATE: June 22, 2010                     LAVELY & SINGER

7                                   PROFESSIONAL CORPORATION
                                  MARTIN D. SINGER

8                                   ALLISON HART SIEVERS

9

                                  By: _____

10                                     MARTIN D. SINGER
                                Attorneys for Plaintiffs WAYNE

11                                     JACOBSEN and BRAD
                                  CUMMINGS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Publishing Contract with Windblown Media

AGREEMENT dated May 10, 2008 by and between WINDBLOWN MEDIA, 4680 Calle Norte, Newbury Park, CA 91320 (the "Publisher") and William P. Young, 1857 SW 35th Street, Gresham Oregon, 97080 (the "Author"), with respect to the fiction work provisionally entitled THE SHACK (the "Work"), as further described below. In the event more than one work is referred to herein, they shall be individually and collectively called the "Book(s)" or the "Work," as the context indicates.

1.     **GRANT OF RIGHTS:** (a) The Author hereby grants and assigns to the Publisher exclusive print, audio and electronic rights in the Work (and any revisions thereof), in whole or in part for the full term of copyright (including any renewals and extensions), in all languages, including the right to reproduce, publish, distribute, transmit, deliver, transfer, market and/or sell the Work, by any means including, but not limited to, fixed-copy, digital delivery, download, streamed formats, shared file distribution and wireless methods, in any media now known or hereafter devised, throughout the world (the "Territory"). The Publisher may exercise and authorize others to exercise the above-described rights including the rights specified below in paragraph 4.

(b)     The Work is described as follows: a fictional encounter between Mackenzie Allen Phillips and God over the depth of sadness caused by the murder of his daughter. The Work shall consist of approximately 80,000 words.

(c)     The Author grants to the Publisher and its licensees the irrevocable right to use the Author's name and likeness on the Work and in the sale, marketing and advertising of the Work.

(d)     For the purposes of this Agreement, audio rights shall mean the right to use the Work as the basis for one or more sound recordings consisting of abridged and/or unabridged versions of the Work in audible form or in a form which can be rendered into audible form (hereafter referred to as an "Audio Work"). The scripts of all abridged versions will be submitted to the Author for approval. The Audio Work may contain, in addition to the Work, narrative or interstitial passages and background music and sounds supplied by the Publisher.

(e)     For the purposes of this Agreement, electronic rights shall mean the right to transform the content of the Work (i.e., including text and any illustrations, etc.) into electronic, digital and magnetic media (whether now known or hereafter devised) without any material video or audio enhancement (the "Electronic Versions"), and shall include the right to publish and make available Electronic Versions, alone or in conjunction with other written or illustrative materials (e.g., as part of a package, group, bundle, subscription, installment series or other multiple work method).

(f)     In the event the Author provides or approves of additional material in connection with the Work such as a brief interview/Q&A session with the Author and/or other incidental material ("Bonus Material"), the Publisher may include such Bonus Material as part of the Audio Work and/or as part of the Electronic Versions and such Bonus Material shall be deemed part of the Work. With respect to any Bonus Material provided to the Publisher by the Author, the Author will be responsible for obtaining at the Author's own expense all permissions or releases necessary for the Publisher to reproduce, publish, and sell such material in the Audio Work and the Electronic Versions in accordance with the terms of subparagraph 6(b) hereof.

(g)     For the purposes of this Agreement, the following terms shall have the meanings set forth below:

(i)     performance rights shall mean the right to produce dramatic adaptations of the Work, including but not limited to motion picture, theatrical, television, radio, animation and other similar derivative, dramatizations based on the Work.

(ii)     multimedia rights shall mean the right to produce derivative adaptations of the Work, whether sequential or non-sequential, together with material additional elements (such as added sounds, images or graphics), including but not limited to CD-Rom, videocassette and DVD formats;

(iii)     merchandising rights shall mean the right to produce merchandise of every nature, including but not limited to, still photographs, drawings, artwork, toys, games, wearing apparel and similar items which make reference to or are based upon the Work or any part thereof;

2.     **ADVANCE:**   No advance is sought or offered in view of this contract.

3.     **ROYALTIES:**     Royalties shall accrue to the Author's account from sales by the Publisher of the Work, in whole or in part, in any media, as set forth below.  For the purposes of this Agreement, the term "retail price" shall mean the suggested retail price for the Work less any freight pass-through increment, and the term "net sales revenue" shall mean all sums actually received by the Publisher from its sales of the Work, less any applicable taxes, and any commissions or fees to third party agents or distributors incurred in making such sales.

(a)     *On copies sold in the United States:*  Author shall receive a fixed rate of $.50 (fifty cents) per book sold for paperback books and $1.00 for hardback books, plus one-third of the net profits of all activity generated by *The Shack* for Windblown Media. Prior to the beginning of any reporting period (January 1 or July 1), the Author, by written communication with the Publisher, may opt-out of the profit-sharing plan and receive a royalty of 10% of retail on hardback books and 18% of retail on trade paperback books.  This royalty will be divided 60% to William P. Young, 20% to Wayne Jacobsen and 20% to Brad Cummings.

(b)     On all other products the royalty rate will be divided 60% to William P. Young, 20% to Wayne Jacobsen and 20% to Brad Cummings.

(c)     *Audio Work editions:*
(i)     50% of net sales revenue on all copies sold as packaged units (such as tapes and CDs) in the United States

(ii)     50% of net sales revenue on all copies sold as packaged units (such as tapes and CDs) outside the United States

(iii)     50% of net sales revenue on all copies transmitted by means of digital delivery.

(d)     *Electronic Versions:*
(i)     25% of Net Electronic Sales Receipts (as that term is hereafter defined below) on all copies sold.  In the event the imprint publishing the Work generally offers its authors a

higher base royalty rate for Electronic Versions, the Publisher will thereafter increase the Author's base royalty to such rate.

(ii)     "Net Electronic Sales Receipts" shall mean all monies actually received by the Publisher from sales of the Electronic Versions as defined in subparagraph 1(e) above, less any applicable taxes, handling or processing fees paid by the Publisher, customer refunds resulting from bona fide ordering, billing or other errors in the transmission of the Work and commissions or fees payable to third parties (such as web hosters and digital rights management providers) incurred in connection with effecting the transaction or transmission of the Electronic Version to the customer. No deductions shall be made for normal overhead expenses. In the event the Electronic Version is sold by the Publisher in conjunction with other work(s) or as part of a package, group, bundle, subscription, installment series or other multiple work method, the royalty shall be multiplied by the Share Fraction. "Share Fraction" means a fraction, the numerator of which is the number of consumer downloads or readings of the Work and the denominator of which is the number of consumer downloads or reading of all works in the package, group, bundle, subscription, installment series or other multiple work method in which the Work is included.

(e)   *High discount; premium; large quantity; direct marketing:*
Notwithstanding the above, royalties for copies sold at a discount of 55% or greater off the retail price, premiums (defined as promotional items not for individual resale), and copies sold as a result of the Publisher's direct marketing programs, shall be 10% of net sales revenue for hardcover editions and 5% for all other editions (e.g. large print).

(f)   *Calendars and posters:*
On any calendars or posters derived from the Work, the royalty rate shall be 10% of net sales revenue.

(g)   *Non-royalty dispositions:*
No royalty shall be payable to the Author on copies of the Work destroyed, distributed without charge for purposes of review, advertising, publicity, sample or the like, disposed of at or below cost, copies sold to the Author hereunder, or copies supplied free of charge to charitable institutions.

(h)   *Merchandising*
On any merchandise adapted from the Work, the royalty rate shall be 10% of net sales revenue.

(i)     All other products will be negotiated on a case-by-case basis with customary publishing practices.

4.     RIGHTS AND LICENSING REVENUE: (a)     The Publisher shall be entitled to exercise and license the rights granted in this Agreement in the Work, in whole or in part, upon such terms as it deems advisable, and the Author shall earn a share of the Publisher's "net licensing revenue" as set forth below. The term "net licensing revenue" shall mean all sums actually received by the Publisher from licensing rights in the Work, less any commissions to sales agents and foreign taxes incurred by the Publisher in disposing of such rights, and shall exclude the Publisher's reasonable charges to licensees for the manufacture, handling and

delivery of copies of the Work. The Author's Share will be divided 60% to William P. Young, 20% to Wayne Jacobsen and 20% to Brad Cummings.

| | Rights | Publisher's Share | Author's Share |
|---|---|---|---|
| (i) | First serial | 10% | 90% |
| (ii) | Foreign language (including print, Audio Work, Electronic Versions, serial, full-length, condensed or abridged formats) | 25% | 75% |
| (iii) | British Commonwealth (including print, Audio Work, Electronic Versions, serial, full-length, condensed or abridged formats) | 20% | 80% |
| (iv) | Abridgment, adaptation, anthology, Audio Work, book club, calendar, condensation, deluxe, digest, educational, Electronic Versions, graphic, hardcover reprint, large print, library, merchandise, microfiche, microfilm, multimedia, omnibus, paperback reprint, permission, poster, second serial and syndication | 50% | 50% |
| (v) | Performance | 10% | 90% |

(b)     The Publisher may license the reproduction in Braille or other publication of the Work, in whole or in part, for the disabled, without charge.

(c)     In the event the Publisher exercises any of the rights specified in paragraph 4 itself in lieu of licensing same, the royalty rates, where not otherwise provided for in paragraph 3 above, shall be consistent with prevailing book industry standard.

5.     RESERVED RIGHTS:     (a)     All rights not granted to the Publisher hereunder are reserved to the Author.

(b)     The Author specifically retains the motion picture and theatrical rights and agrees to act in concern with Windblown Media in the disposition of those rights. Revenue generated by their sale will be split 60% to Author, 20% to Brad Cummings, and 20% to Wayne Jacobsen. The Author will notify the Publisher of any exploitation of reserved rights and the Publisher may utilize such information in connection with marketing the Work.

6.     AUTHOR'S RIGHTS TO TERMINATE:     (a)     A Work shall be available for sale as long as the Publisher has the Work in stock, or an outstanding license is in effect, or if earnings accruing to the Author from the Work total more than $500 cumulatively over two consecutive royalty periods.

(c)     If more than one Book is covered under this Agreement, it is understood that any termination or reversion pursuant to subparagraphs 7(a) or 7(b) shall apply only to the Book to which the conditions of such subparagraph apply.

(d)     In the event of a filing of bankruptcy by the Publisher, to the extent permitted by law, the Author shall have the right to buy back the rights granted herein at fair market value, and thereupon this Agreement shall terminate, except for the Publisher's right to complete production for any work in process and dispose of any existing inventory.

7.     PUBLICATION OF THE WORK: (a)  Subject to paragraphs 7 and 8, the Work will be published not later than 24 months after the Publisher's acceptance of the Work, including the Related Materials and any necessary index, permissions and releases, and in such formats, style, manner, and under such imprints, in such quantities, and at such prices as the Publisher deems appropriate.  Such period may be extended in the event the Publisher fails to publish due to forces beyond its reasonable control.

(b)     The Author authorizes the Publisher to make the manuscript of the Work conform to its standard style in punctuation, spelling, capitalization and usage.  Except as may be otherwise expressly provided in this Agreement, no other changes will be made to the manuscript without the Author's consent.

(c)     Other than listings in paperback editions of other works by the Author and other similar works published by the Publisher, the Publisher agrees not to insert any advertising into its editions of the Work, except that other editorial and/or advertising materials may appear with the Electronic Versions (e.g., banner ads or notices on a web page) consistent with industry customs and practices.  The Publisher agrees to pass the foregoing restrictions on to all licensees (other than to licensees with licenses for book club editions, condensed books, reprint paperback editions and/or for use of extracts from the Work in periodicals).

8.     PUBLICITY: (a)  The Publisher shall determine, in its good faith business judgment, how it shall advertise, publicize and/or promote the Work, including making selections of the Work available in any and all media, whether print, video, television, radio, world wide web, wireless, podcast or mobile, to promote the sale of the Work.

(b)     In the event the Publisher requests the Author to participate in publicity for the Work, the Author agrees to perform such promotional or publicity services.  The Publisher shall consult with the Author before scheduling events and shall bear all the reasonable and customary costs and expenses of such publicity. The Author agrees to comply with the Publisher's instructions and guidelines regarding such publicity.   It is understood that performance of the Author's obligations under this paragraph shall constitute a material term of this Agreement.

(c)     In the event the Author desires to obtain or perform any publicity independently of the Publisher in connection with the Work (such as interviews, website activities, personal appearances), the Author agrees to coordinate all such activities with the Publisher's Publicity Department.

(d)     In the event the Author has reserved performance rights, the Publisher acknowledges that a third party producer or motion picture company which acquires rights to create a dramatic work based upon the Work may publish in printed form an excerpt from the Work or from such dramatic work, of not more than 7,500 words or 10% of the Work, whichever is less in the aggregate, for purposes of trade advertising or promoting said dramatic work and not for sale to consumers.

9.     AUDIO RECORDING SERVICES:   If the Publisher requests, the Author agrees to render services as a reader of abridged and/or unabridged scripts of the Audio Work.  The Author agrees to promptly and faithfully comply with all of the Publisher's reasonable instructions and requests in connection with said recordings.  All reasonable expenses in connection with such services shall be borne by the Publisher.

(a)     The Publisher will notify the Author in advance of its requirements with respect to the date(s) and timing of recording session(s).  The precise dates and times will be scheduled by the Publisher in consultation with the Author.  During the initial recording session and continuing up to for 15 days thereafter the Author will be available to appear at additional times as may be designated by the Publisher (subject to the Author's prior professional commitments) for "retakes" or additional recordings with respect to the Audio Work if the Publisher deems it necessary or advisable to achieve a satisfactory result.

(b)     (i) The Author acknowledges that all recordings made in connection with the Audio Work and all performances embodied therein including recordings of the Author reading the Work (collectively, the "Recordings") shall be "work made for hire" as that term is defined under the U.S. Copyright Act, specially commissioned by the Publisher.  To the extent, if any, that any such Recordings are determined not to be "work made for hire," the Author hereby assigns to the Publisher any and all rights the Author may have in the Recordings, including all copyrights, it being understood that nothing herein is intended or shall be deemed to assign copyright in the literary work upon which the Recordings are based.  The © copyright in any Audio Work shall be owned by the Author, and the (p) copyright shall be retained by the Publisher.  The Publisher shall include the following copyright notices in each copy of the Audio Work:

Copyright (p) [year] by Windblown Media
Copyright © [year] by William P. Young

(ii)     The Publisher shall have the right to use, refrain from using, change, add to and subtract from the Recordings, consistent with current industry practice.  Without limiting the foregoing, the Publisher shall have the right to include the Recordings in the Audio Work.  The Author hereby grants to the Publisher the right to use the Recordings (or parts thereof) for advertising and promotional purposes in connection with the Work and/or Audio Work.

10.     COPYRIGHT: (a)     The Publisher agrees to submit an application for registration of the copyright in the Work in the name of the Author in the United States of America.  The Author agrees that the Publisher may record this Agreement or a memorandum hereof in the United States Copyright Office.  The Author hereby appoints the Publisher to be the Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to the Publisher hereunder.  The Publisher shall include the following copyright notice in each of its editions of the Work:

Copyright © [year] by William P. Young

(b)     If the Work or any portion of the Work has been previously published or will be published prior to the Publisher's publication, the Author shall submit an application for registration of the copyright in the Author's own name or obtain and deliver to the Publisher a duly executed and recorded assignment of copyright, a reversion of rights from the previous publisher or a permission in accordance with paragraph 6, along with the appropriate copyright notice to be included in the Publisher's editions of the Work.

Author Agt.10 07                                        6

(c)     In the event that any copyright in the Work is infringed, the Author and the Publisher may agree on a joint action in regards thereto, failing which either party shall have the right to proceed. If the parties proceed jointly, the expenses and recoveries, if any, shall be shared equally; if they do not proceed jointly, the party going forward with such action shall bear all expenses and shall retain any recovery. In no event shall either party be liable to the other for failure to take action.

**11.    OPTION: (a)**        The Author agrees to submit exclusively to the Publisher, for consideration as below described, the Author's next book-length fiction/non-fiction manuscript before submitting same or proposals therefor to any other party.

(b)     The Publisher shall have a period of 60 days after the submission of a detailed proposal and at least three sample chapters (which period shall not commence to run prior to 90 days after acceptance of the Work), within which to notify the Author whether it desires to publish such next work. If within said time the Publisher notifies the Author of its desire to publish the Author's next work, the Author shall thereupon negotiate in good faith exclusively with the Publisher with respect to the terms of such publication. If the Publisher and the Author are unable to arrive at a mutually satisfactory agreement after negotiating for a period of 60 days, the Author shall be free to submit such next work elsewhere; provided however that the Author shall not enter into an agreement for publication of said work (or a substantially similar work) upon financial terms equal to or less favorable than those offered by the Publisher, and, in the event of a more favorable offer, the Publisher is given 30 days to acquire such next work by matching the best financial terms offered in writing to the Author by the third party.

**12.    CONFLICTING PUBLICATION: (a)**        During the term of this Agreement, the Author shall not, without written permission of the Publisher, publish or permit to be published any material based upon or incorporating material from the Work or which would compete with its sale or impair the rights granted hereunder.

(b)     Subject to the terms above, the Author agrees that in no event will the Author publish or authorize publication of any other book-length work of which the Author is an author, contributor or collaborator until six months after publication of the Work.

**13.    AUTHOR'S WARRANTIES: (a)**        The Author warrants, represents and covenants: that the Author owns all rights and licenses herein conveyed and has the full and sole right and authority to convey all such rights and perform the Author's obligations hereunder; that the Work will be the Author's next book-length work (whether under the Author's own name or otherwise); that the Work is original with the Author in all respects, except for any portion which has been previously published and is identified as such; that, with respect to works of non-fiction, all statements contained in the Work as published are true or based on reasonable research for accuracy; that the Work is not in the public domain and is or may be validly copyrighted or registered for copyright in the United States and is likewise protectible throughout all countries in the territory where the laws provide for such protection; that the title of the Work may be used by the Publisher in the exercise of all or any of the rights herein conveyed; that the use or reproduction of the Work or any part thereof or the exercise of any of the rights herein granted, will not in any way infringe upon any statutory or common law copyright or trademark, or give rise to a claim of a libel or defamation, or invasion of the rights of privacy or of publicity of any party, or violate any law or regulation; that the Author has not done and will not do any act or thing that has or will in any way impair, prevent or interfere in any manner with the full and exclusive enjoyment by the Publisher of any of the rights or licenses herein conveyed; that the

Author is not under any agreement or obligation to mention any product, service or brand name in the Work, or as part of promotion for the Work, in exchange for payment or other consideration from any third party; that to the knowledge of the Author there are no claims or litigation pending or threatened, which might adversely affect or in any way prejudice the Publisher's exclusive rights in the Work or any of the rights or licenses herein granted and the Author knows of no basis on which such a claim may be asserted and will promptly notify the Publisher in writing if such knowledge changes; that the use, with reasonable care and skill, of any recipe, instruction, material, advice or formula contained in the Work will not result in injury, and the Author will include in the Work appropriate warnings and safety precautions concerning any potential hazards that may be involved in the use of any such recipe, instruction, material, advice or formula.

(b)     The warranties, representations and covenants hereunder, along with the indemnity set forth in paragraph 18 below shall apply to the Work and any revisions thereof and shall survive any termination of this Agreement.

14.     INDEMNITY: (a)     The Author undertakes to indemnify and hold harmless the Publisher and its officers, directors, agents, employees, licensees and assigns from and against any liabilities, damages, costs, expenses (including reasonable counsel fees), judgments, settlements, penalties, or losses of any kind or nature whatsoever which may be incurred by the Publisher or its officers, directors, agents, employees, licensees or assigns for or in connection with any claim, action or proceeding inconsistent with any of the representations or warranties herein contained or based upon or arising out of anything contained in the Work (a "Claim"). The Publisher and the Author shall each with all reasonable promptness notify the other of any Claim.

(b)     In the event of any such Claim, the Publisher shall select counsel and undertake the defense thereof.  The Author shall have the right (but not the obligation) to have separate counsel at the Author's own expense, it being understood that the conduct of the defense shall remain under the Publisher's control.  The Author shall cooperate fully with the Publisher in the defense of any Claim and the Author agrees to maintain the confidentiality of all communications relating to the Claim.

(c)     The Publisher agrees to cover the Author as an additional insured under any Errors and Omissions insurance maintained by the Publisher with respect to Claims of libel, invasion of privacy, violation of the right of publicity, copyright infringement and trademark infringement arising from the Publisher's publication of the Work.  In the event such a Claim is asserted against the Publisher and/or the Author, the Errors and Omissions insurance in effect at the time such Claim is asserted shall be applicable and the Publisher and the Author shall equally share all costs, judgments and settlements not covered by the insurer.  Any coverage by such insurance shall be applied towards satisfaction of the Author's indemnity obligations under paragraph 18, provided however that the Author shall be responsible for all costs, judgments and settlements attributable to willful or reckless breach by the Author of any of the Author's representations or warranties under this Agreement. [the above clause (c) not applicable to Authors that are corporate entities.]

(d)     During the pendency of such Claim, the Publisher may withhold payments due to the Author under this or any other agreement to the extent reasonably necessary to conduct the defense thereof and to satisfy any liability therein.

Author Agt.10 07                                        8

(e)     If, in the opinion of the Publisher, the Work contains material which may involve the Publisher in litigation, the Publisher may elect to engage outside legal, professional or technical expert(s) to review the manuscript. The Author will cooperate fully with the Publisher and its representatives conducting such review, and the Author agrees to maintain the confidentiality of all communications relating to such review. If the Author refuses to make such changes as are advised by the Publisher or its reviewer(s), the Publisher will have no obligation to publish the Work, and will have the right to terminate this Agreement in accordance with the terms of paragraph 8(c). Notwithstanding any expert review which may be obtained by the Publisher, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or relieve the Author of any of the obligations assumed by the Author hereunder.

15.     ACCOUNTING STATEMENTS:  (a) The Publisher shall render semi-annual statements of account covering sales (less returns, actual and estimated) and net licensing revenues as of June 30 and December 31, and shall mail such statements to the Author not later than the following September 30 and March 31, together with the payment of amounts due thereon.

(b)     The Publisher may deduct any overpayment of royalties or any other amounts due the Publisher from the Author under this or any other agreement, from any payments due from the Publisher to the Author under this or any other agreement. (An unearned advance shall not constitute an overpayment or a sum due from the Author.)

(c)     At the Publisher's election, the Author shall repay any overpayments made to the Author and not deducted pursuant to subparagraph 19(b) above within 30 days of receipt.

16.     AUDIT RIGHTS:  The Author may, at the Author's own expense, audit the books and records of the Publisher relating to the publication of the Work pursuant to this Agreement at the place where the Publisher maintains such books and records in order to verify statements rendered to the Author hereunder. Any such audit shall be conducted only by an independent certified public accountant during reasonable business hours in such a way as to not interfere with the Publisher's normal business activities. In no event may an audit with respect to activity currently reported on a statement commence later than 24 months from the date of such statement, nor shall any audit continue for longer than five consecutive business days, nor shall audits be made hereunder more frequently than twice annually nor shall records supporting any such statements be audited more than once. All statements rendered hereunder shall be binding upon the Author and not subject to objection for any reason unless such objection is made in writing stating the basis thereof and delivered to the Publisher within 24 months from delivery of such statement, or if an audit is commenced prior thereto, within 30 days from the completion of the relative audit. In the event that an underpayment of five percent (5%) or more of amounts actually due to the Author is discovered in the course of any such audit, then the cost of such audit, up to the amount of the underpayment, but not to exceed five thousand dollars ($5,000.00), shall be borne by the Publisher and the Publisher shall pay any underpayment within thirty (30) days of the Author's written request. The term "underpayment" shall not include any disputes as to reasonable and customary amounts retained by the Publisher as reserves against returns.

17.     PUBLISHER NOT A TRUSTEE:  In no event shall the Publisher be obligated to segregate from any of its other funds, any of the sums which may be paid to the Publisher by customers or other parties relating to the Work, nor shall the Publisher be considered a trustee, pledgeholder or fiduciary of the Author.

18.    MULTIPLE AND ACTUAL AUTHOR(S): (a)       If there are multiple individuals comprising the Author under this Agreement, the obligations of all such individuals shall be joint and several unless otherwise expressly provided in this Agreement.  The Publisher may deal with any one or more of such individuals with respect to matters arising under this Agreement, and any one such individual is authorized to bind the Author hereunder.  The Publisher may, at its sole discretion, exercise any or all of its remedies against one or more of such individuals.  In the event a dispute arises between such individuals which threatens to involve the Publisher in litigation, the Publisher shall have the right to cancel this Agreement unless such dispute is settled or finally determined by court order within 90 days, and recover the Advance from any one or all of the individuals comprising the Author.

(b)     In the event that the Author under this Agreement is not the actual author or authors of the Work, then all references to the Author in those provisions of this Agreement dealing with use of the Author's name and likeness, option on the Author's future work or any other instances requiring the personal services of the Author, shall be deemed to refer to each of the actual author or authors.

19.    APPROVALS: Wherever under the terms of this Agreement the Author's approval or consent may be required, such approval or consent shall not be unreasonably withheld or delayed.  The Author agrees to notify the Publisher in writing, specifying particular objections to any item the Author does not approve of.  Notification of disapproval must be received within five business days, unless a different approval period is specifically provided for in the Agreement, or the Author's approval or consent shall be deemed granted.

20.    ASSIGNMENT: (a)  This Agreement shall be binding upon the assigns, heirs, executors, and administrators of the Author, and upon the assigns and successors of the Publisher.

(b)     This Agreement and the rights and benefits hereunder shall not be assignable or transferable by the Publisher except to a corporate parent, affiliated company or a wholly owned subsidiary or in connection with a transfer of all or substantially all of the Publisher's assets or any imprint(s), or upon consent of the Author (such consent not to be unreasonably withheld).  Notwithstanding the above, rights granted hereunder may be exercised by the Publisher or the Publisher's affiliates.

(c)     The Author shall not assign any of the Author's obligations hereunder, and any such purported assignments shall be void, but the Author may on written notice to the Publisher, assign or transfer any monies due or to become due under this Agreement.  If at any time more than three parties shall be entitled to receive payments which would otherwise be due to the Author hereunder the Publisher may, at its option, require that all such parties execute and deliver an agreement in form satisfactory to the Publisher appointing a disbursing agent for all such parties.

21.    NOTICES: All notices which either party hereto is required or may desire to give to the other shall be in writing and given by addressing the same to the attention of the Publisher and to the Author at the address set forth on page 1 or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph.  All such notices shall be sufficiently given when the same shall be sent by registered or certified mail postage prepaid.

22.    ENTIRE AGREEMENT; MODIFICATION:    This Agreement represents the entire

agreement between the parties and supersedes all prior agreements and understandings with respect to the subject matter hereof, and the Author acknowledges that the Author has not relied on any understanding or agreement not set forth in this Agreement. This Agreement shall not be modified except in writing signed by the party charged therewith. No written waiver of any term or condition of this Agreement shall excuse the performance of any act other than those specifically referred to therein.

23.    CONSTRUCTION; JURISDICTION:    This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to agreements executed and fully performed therein. It is agreed that California courts (state and federal) only, will have jurisdiction over any controversies regarding this Agreement; any action or proceeding which involves such a controversy will be brought only in those courts, in New York County.

24.    HEADINGS: The headings of the paragraphs of this Agreement are for convenience of reference only, are not part of this Agreement, and shall not limit or otherwise affect the meaning of this Agreement.

30.    EFFECTIVENESS OF AGREEMENT: This Agreement shall be of no force and effect unless signed by the Author and the Publisher within 90 days of the date first written above.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the latest day and year written below.

Author  _WILLIAM PAUL YOUNG_

Social Security No.: 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

Date: 5/14/2008

[Publisher]

By: _____

Name: BRAD CUMMINGS

Title: PRESIDENT, WINDBLOWN MEDIA

Date: 5/19/2008

# EXHIBIT B

**Letter of Understanding**

This letter is to memorialize our understanding on this date of Thursday, May 1, 2008 with regards to the motion picture rights to the literary work entitled THE SHACK copyright # TX0006578498 written by William P. Young.

The motion picture rights will be held by William P. Young until an LLC is formed by the undersigned to produce the movie. A Literary Option and Purchase Agreement will then be drafted and the Option exercised between the LLC and the Author. At the signing of the Option Agreement the rights are then owned by the LLC. Once funding for the motion picture budget is raised and placed in the LLC, the Literary Purchase Agreement will be exercised. Author will receive a customary deal with front-end and back-end participation.

Once inside the LLC, the value placed on ownership of motion picture rights is purely seen in terms of creative authority and is of utmost importance to be maintained. The creative authority will remain equally shared and split four ways.

Monetary value of the motion picture rights will only be of concern if the motion picture rights are sold prior to the LLC being formed. If that event occurs, the receipts from that sale will be split evenly amongst the four.

The four individuals signed here below will be rewarded financially on the front-end and back-end based on resources, time and risk put into the development, production, post-production and release of the motion picture.

We'll use best efforts to assign producing type credits to all four individuals (either Executive Producer, Co-Producer, Associate Producer, with the Producer credit being retained by the person(s) putting the entire motion picture project together.

William P. Young

Wayne Jacobsen

Brad Cummings

Bobby Downes

# EXHIBIT C

FROM : CUMMINGS          PHONE NO. : 805 499 4260          May. 14 2008 11:35PM P2

REDACTED

## Publishing Co-Venture

AGREEMENT dated May 13, 2008 by and between Hachette Book Group USA, Inc., 237 Park Avenue, New York, NY 10017 ("HACHETTE") and Windblown Media, Inc., 4680 Calle Norte, Newbury Park, CA 91320 ("WINDBLOWN").

WHEREAS, WINDBLOWN has published an important literary work entitled *The Shack* by William P. Young, and WINDBLOWN owns and controls all publishing rights in *The Shack*;

WHEREAS, WINDBLOWN has published other literary works listed on Exhibit I hereto by title and format (the "Pre-existing Titles"), and WINDBLOWN owns and controls all publishing rights in said works:

WHEREAS, HACHETTE is in the business of large scale publishing, distribution, marketing, selling, and licensing of books throughout the world;

WHEREAS, HACHETTE recognizes that WINDBLOWN is the creative enterprise behind the successful publication of *The Shack*;

WHEREAS, HACHETTE and WINDBLOWN would like to collaborate to bring *The Shack* to greater numbers of readers worldwide by means of aggressive marketing and distribution, and the parties intend to share the proceeds from this collaboration; and

WHEREAS, both parties expect that the combination of WINDBLOWN's creative excellence with HACHETTE's marketing, sales and distribution expertise in this publishing co-venture will maximize successful publication of *The Shack* and help build the WINDBLOWN name as a publisher of quality books;

NOW, THEREFORE, the parties hereto agree as follows:

1. Exclusive Rights. (a) WINDBLOWN grants HACHETTE the exclusive right to produce, market, distribute, license and sell *The Shack* and the Pre-existing Titles in all formats and languages throughout the world, except as provided in subparagraph 1(b) below.

   (b) Notwithstanding the above, to the extent that WINDBLOWN has already licensed foreign language rights and/or audiobook rights to *The Shack* and the Pre-existing Titles to a third party, WINDBLOWN will identify all such existing agreements on the attached Exhibit I (the "Pre-existing Licenses") and HACHETTE agrees to honor the Pre-existing Licenses.

   (c) WINDBLOWN grants HACHETTE the exclusive right to produce, market, distribute, license and sell new books published by WINDBLOWN other than *The Shack* and the Pre-existing Titles (the "Additional Titles," it being understood that *The Shack*, the Pre-existing Titles and the Additional Titles are collectively referred to herein as the "Books") in all formats and languages throughout the world during the term of this Agreement.

   (d) WINDBLOWN hereby exclusively authorizes HACHETTE to convert the *Books to electronic* book and digital audio formats, and grants HACHETTE the exclusive right to produce, market,

distribute and sell electronic and digital audio versions of the Books (excluding digital audio versions of *The Shack* and the Pre-existing Titles in the event that WINDBLOWN has already licensed such rights pursuant to the Pre-existing Licenses).

(e) WINDBLOWN reserves all rights not expressly granted to HACHETTE under this Agreement. Specifically, WINDBLOWN reserved the right to continue distribution and sales on the www.lifestream.org and the www.windblownmedia.com websites of *The Shack* and the Pre-existing Titles ("Reserved Rights").

2.  **WINDBLOWN Responsibilities.**  WINDBLOWN shall be responsible, at its sole expense, for the following:

(a) WINDBLOWN will secure all rights, including copyright and related rights in the Books from the authors of the Books. WINDBLOWN shall negotiate and execute written publishing agreements with all authors of the Books. WINDBLOWN's agreements with the authors of each of the Books will provide for the respective authors' commitment to engage in promotional activities (which may include media appearances, touring and book signing events) as arranged by HACHETTE.

(b) In addition to *The Shack* and the Pre-existing Titles, WINDBLOWN will acquire and develop manuscripts and writers for the Additional Titles, it being estimated that approximately four to six Additional Titles may be published per year.

(c) WINDBLOWN will be responsible for all editing of the Books.

(d) WINDBLOWN will provide all information necessary for HACHETTE to compute author royalties arising out of HACHETTE's sales and licenses under this publishing co-venture. WINDBLOWN will make all author payments arising out of the Reserved Rights and the Pre-existing Licenses.

(e) WINDBLOWN will provide HACHETTE with creative input in developing overall marketing strategy for each of the Books, as further described in paragraph 4 below.

3.  **HACHETTE Responsibilities.**  HACHETTE shall be responsible, at its sole expense for overhead (it being understood that out of pocket costs will be accounted for under paragraph 7(b)(ii) below), for the following functions:

(a) copy-editing and proof-reading manuscripts
(b) production and manufacturing
(c) marketing, promotion, publicity and media coverage (as set forth in paragraph 4 below)
(d) warehousing and inventory management
(e) trade and special sales
(f) order entry
(g) order fulfillment (pick, pack and handling services)
(h) shipping
(i) returns receipt and processing
(j) credit and collection from accounts
(k) customer service
(l) advertising (including co-op advertising)

FROM : CUMMINGS                    PHONE NO. : 805 499 4260          May. 14 2008 11:36PM P4

(m) copyright registrations (as set forth in paragraph 5(c) below)
(n) royalty reporting to authors (subject to paragraph 2(d) above)
(o) audiobook production, including script abridgement (subject to paragraph 1(b) above)
(p) e-book conversion, including multiple platforms
(q) rights licensing (including print, audio and electronic rights exploitation) in close consultation with WINDBLOWN
(r) representation at appropriate book publisher trade shows

4.  Publishing Program.  (a) HACHETTE and WINDBLOWN shall meet on a quarterly basis (or as needed) to discuss publishing plans for each Book, including format and specs, manuscript delivery dates, release dates, print runs, sell-in strategy for retail accounts, marketing plans for launch, coop advertising and consumer advertising. Specifically, HACHETTE will obtain WINDBLOWN's approval of the overall marketing plans for the launch of each of the Books. HACHETTE shall arrange such meetings in NY or Nashville, as mutually agreed. It is understood that each party shall bear its own expenses for attending such meetings and its own overhead costs.

(b) It is agreed that HACHETTE's NY communications office will handle general market press for *The Shack* and any Additional Titles, and WINDBLOWN will have the right to approve any outside public relations firm hired by HACHETTE for said titles.

(c) HACHETTE will obtain WINDBLOWN's approval of the cover design of all of the Books. At WINDBLOWN's request, HACHETTE will endeavor to engage the graphic designer(s) suggested by WINDBLOWN (subject to agreement on reasonable design fees).

(d) It is intended that HACHETTE and WINDBLOWN will cooperate as "partners" in the publishing co-venture relationship, collaborating on all major decisions regarding publishing marketing, promotion and publicity of the Books.

(e) With respect to the Additional Titles, WINDBLOWN shall adhere to the requirements of HACHETTE and its printers for transmitting the manuscripts in computer disc format and for scheduling and preparing necessary materials for manufacture and marketing of each title.

5.  Credits and Notice.  (a) All of the Books shall display the WINDBLOWN name and logo on the cover and /or spine per WINDBLOWN's written instructions. The copyright page of each Book shall display WINDBLOWN's name and logo, and the following notice: "Published in association with Hachette Book Group USA. Distributed by Hachette Book Group USA."

(b) The copyright page of *The Shack*, and the copyright page of all Additional Titles including the words "The Shack" in the title, will include a trademark notice in WINDBLOWN's name.

(c) HACHETTE will register with the U.S. Copyright Office: (i) the © copyright in the Books in the name of WINDBLOWN, or such other copyright owner(s) as directed by WINDBLOWN; and (ii) the (p) copyright in the audiobook version of Books produced by HACHETTE in the name of WINDBLOWN.

6.  HACHETTE Advance.  In consideration of the exclusive rights granted herein to HACHETTE, HACHETTE will pay WINDBLOWN as an advance against WINDBLOWN's earnings under paragraph 7 of this Agreement the sum of ██████████████████████████.

payable as follows: ███████ upon signing of this Agreement by both parties; and ███████ upon HACHETTE's initial U.S. release of *The Shack*.

7. Sharing of Defined Proceeds. (a) HACHETTE will prepare on a quarterly basis, based on HACHETTE's fiscal quarter end, a cumulative aggregate statement (the "Statement(s)") for each of the following three categories of Books: (i) *The Shack*, (ii) the Pre-existing Titles, and (iii) the Additional Titles (the "Accounting Categories").

(b) With respect to each Book and the aggregate for each Accounting Category, the Statements will set forth: (i) the number of copies shipped by HACHETTE hereunder minus actual and estimated returns ("Net Copies"); and (ii) the "Defined Proceeds" computed in accordance with paragraph 7(c) below. Statements will be prepared as of March, June, October and December, and will be mailed to WINDBLOWN within 30 days after the end of the month, along with payments due thereon.

(c) Defined Proceeds for each Book and Accounting Category shall be determined by calculating all "Revenues" received by HACHETTE minus all "Expenses" incurred by HACHETTE, it being understood that the terms "Revenues" and "Expenses" are defined as follows:

(i) "Revenues" shall mean:
   (A) all monies actually received by HACHETTE including its UK, Australia and Canada affiliates, from sales or licenses of the Book(s) (excluding those amounts, if any, charged to licensees for the manufacture and delivery of copies) minus actual returns and a reasonable reserve against future returns ("Net Sales"); and
   (B) any other monies actually received by HACHETTE relating directly to the Book(s).

(ii) "Expenses" shall mean the following out of pocket expenses incurred by HACHETTE:
   (A) all costs of production and manufacturing;
   (B) actual freight, shipping, insurance and handling expenses for the Book(s);
   (C) all costs of marketing, promotion, publicity and media coverage, including online and website marketing expenses, outside designers and public relations expenses, but excluding overhead;
   (D) any foreign taxes or third party or agency fees or commissions;
   (E) any royalty payments to the author(s) of the Book(s) made by HACHETTE;
   (F) HACHETTE's general distribution services fee (covering warehousing, sales, order processing, returns handling customer services, equal to ███████ and
   (G) any other out-of-pocket costs relating directly to the Book(s), including but not limited to audio and ebook costs.

(d) If a Statement reveals a positive balance, the Defined Proceeds will be divided as follows:

(i) As to *The Shack*, WINDBLOWN will receive ██% of the Defined Proceeds from the ███████ Net Copies, ██% of the ███████ Net Copies, and ██% of all Net Copies thereafter, and HACHETTE shall receive the remainder of such Defined Proceeds.

(ii) As to each of the Pre-Existing Titles and the Additional Titles, the Defined Proceeds will be shared ███████ between HACHETTE and WINDBLOWN.

(iii) Any negative balance on a Statement will be carried forward to the following Statement pertaining to the same Accounting Category. For the avoidance of doubt, it is

FROM : CUMMINGS                    PHONE NO. : 805 499 4260          May. 14 2008 11:38PM P6

understood that a negative balance on any of the Additional Titles will not be applied against *The Shack* or the Pre-existing Titles.

8. <u>Examination of Books and Records</u>. Upon request, WINDBLOWN may examine HACHETTE's books and records relating to its sales of the Books pursuant to this Agreement in order to verify Statements rendered hereunder. Absent force majeure, any such examination with respect to a Statement must commence within 24 months from the date of such Statement, and examinations may be made up to twice annually. No Statement may be examined more than once, and Statements will be binding on WINDBLOWN unless written objection (stating the basis thereof) is delivered to HACHETTE within 24 months from delivery of such Statement.

9. <u>Term and Termination</u>. (a) The initial term of this Agreement shall be ███████████████ following execution of this Agreement, and shall thereafter continue until terminated by either party on 180 days' written notice.

(b) The term of this Agreement may be terminated early by either party in the event the other party breaches a material provision of this Agreement and fails to take steps to cure the breach (if it is curable) within 30 days following written notice specifying the nature of the breach.

(c) The term of this Agreement may be terminated early by Hachette in the event that either Wayne Jacobsen or Brad Cummings cease to be an owner of or employee of WINDBLOWN.

(d) Upon the termination of this Agreement, HACHETTE may continue distributing copies of Books printed as of the termination date, subject to the accounting and payment obligations hereunder, except to the extent WINDBLOWN purchases unsold copies at HACHETTE's cost plus freight and handling.

10. <u>Other WINDBLOWN Obligations</u>. (a) WINDBLOWN agrees during the term of this Agreement that it will not, without HACHETTE's written permission, publish or permit to be published any material based upon or incorporating material from the Books or which would directly compete with their sale.

(b) Upon execution of this Agreement, WINDBLOWN will retrieve all film or plates for *The Shack* from its printer(s), discontinue any further printing, and notify all customer accounts that all further orders will be handled by HACHETTE. WINDBLOWN will provide HACHETTE with customer lists and all pricing and discount information in respect of its sales of *The Shack* so that the parties can effect an orderly transition to HACHETTE of all further sales and distribution.

(c) WINDBLOWN will notify HACHETTE of any exploitation of reserved rights (i.e. motion picture rights) so that HACHETTE may utilize such information in connection with marketing and distribution the Books.

(d) In the event that anytime during the term of this Agreement, the owners of WINDBLOWN decide to sell, transfer or dispose of all or any portion of the equity in or assets of WINDBLOWN or the title *The Shack*, WINDBLOWN agrees to notify HACHETTE and offer to HACHETTE the first right to purchase such equity or assets. If no agreement is reached after 30 days' negotiation, then

·FROM : CUMMINGS                    PHONE NO. : 805 499 4260              May. 14 2008 11:39PM P7

WINDBLOWN shall be free to offer such equity or assets to a third party, provided *HACHETTE* shall have a five day period within which to match the financial terms offered by the third party.

11.  Warranties and Indemnities.  (a)  WINDBLOWN warrants, represents and covenants: that WINDBLOWN is authorized to enter into and fully perform this Agreement and that doing so will not breach any obligation or agreement WINDBLOWN may have with any third parties; that WINDBLOWN has acquired all rights to *The Shack* and will acquire all rights to the other Books; that the rights granted hereunder to HACHETTE are free and clear of any encumbrances; that WINDBLOWN is a corporation duly organized and operating in good standing under the laws of the State of California; that the Books will be original; that all statements in the Books are true or based on reasonable research for accuracy; that nothing in the Books will give rise to a claim of libel, defamation, invasion of privacy or publicity, copyright infringement, trademark infringement or violation of any other law, regulation or right; that WINDBLOWN will include HACHETTE as an additional insured under WINDBLOWN's publishing liability insurance; that WINDBLOWN has not done and will not do any act or thing that has or will in any way impair, prevent or interfere in any manner with the full and exclusive enjoyment by HACHETTE of any of the rights herein conveyed; that to the knowledge of WINDBLOWN there are no claims or litigation pending or threatened which might adversely affect any of the rights herein granted to HACHETTE, WINDBLOWN knows of no basis on which such a claim may be asserted and will promptly notify HACHETTE in writing if such knowledge changes.

(b)  HACHETTE warrants, represents and covenants: that HACHETTE is authorized to enter into and fully perform this Agreement and that doing so will not breach any obligation or agreement HACHETTE may have with any third parties; that HACHETTE is a corporation duly organized and existing in good standing under the laws of the State of Delaware; that HACHETTE's marketing sales and distribution will not violate any law, regulation or right; that to the knowledge of HACHETTE there are no claims or litigation pending or threatened which might adversely affect WINDBLOWN's rights in the Books, HACHETTE knows of no basis on which such a claim may be asserted and will promptly notify WINDBLOWN in writing if such knowledge changes.

(c)  The warranties, representations and covenants hereunder, along with the indemnity set forth in section 11(d) below, shall survive the termination of this Agreement.

(d)  Each party (the "Indemnifying Party") undertakes to indemnify and hold harmless the other party, and its licensees, customers, shareholders, officers, directors, agents, employees, and assigns (the "Indemnified Party"), from and against any liabilities, damages, costs, expenses (including reasonable outside counsel fees), judgments, settlements, penalties or losses of any kind or nature whatsoever which may be incurred in connection with any claim, action or proceedings inconsistent with any of the representations or warranties herein made by the Indemnifying Party.  If any such suit, proceeding, claim or demand is brought, the Indemnifying Party  shall undertake the defense thereof with counsel of its own selection, and the Indemnified Party shall have the right (but not obligation) to have separate counsel at the Indemnified Party's own expense, it being understood, that the conduct of the defense shall remain under the Indemnifying Party's control, and Indemnified Party shall cooperate in said defense.

(e)  Under no circumstances shall either party be liable to the other for any incidental, special, exemplary or consequential damages.  Neither HACHETTE nor WINDBLOWN make any

· FROM : CUMMINGS                    PHONE NO. : 805 499 4260              May. 14 2008 11:39PM P8

representations or promises regarding the operation of its business or any future performance or financial results.

12. Confidentiality. The parties agree that the financial terms of this Agreement are confidential and will not be disclosed to any third party without the prior permission of the other party. The provisions of this section 13 will survive the termination of this Agreement.

13. Miscellaneous. (a) This Agreement shall be binding upon the assigns and successors of each party. This Agreement and the rights and benefits hereunder shall not be assignable or transferable by either party except to a corporate parent, affiliated company or a wholly owned subsidiary, or in connection with a transfer of all or substantially all of said party's assets, or upon the consent of the other party, which consent shall not to be unreasonable withheld.

(b) The relationship of the parties hereto is that of independent contractors, and neither party is a partner, agent, employee or joint venturer of the other. Each party shall be solely responsible for its own business operations and obligations and shall have no authority to bind the other except as expressly set forth herein. Nothing contained in this Agreement will prevent HACHETTE from publishing and/or distributing other books and properties on any topic.

(c) This Agreement represents the entire agreement between the parties and supersedes all prior agreements and understandings with respect to the subject matter hereof, and each of the parties acknowledge that it has not relied on any understanding or agreement not set forth in this Agreement. This Agreement shall not be modified except in writing signed by the party charged therewith. No written waiver of any term or condition of this Agreement shall excuse the performance of any act other than those specifically referred to therein. The holding of a court of competent jurisdiction that any provision of this Agreement is invalid or unenforceable shall not affect any other provision of this Agreement, all of which shall remain in full force and effect.

(d) All notices which either party hereto is required or may desire to give to the other shall be in writing and sent to addresses first set forth above. Any notice to HACHETTE shall be sent to the attention of the Chief Operating Officer of HACHETTE with a copy to the General Counsel.

(e) The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

(f) This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set above.


WINDBLOWN MEDIA, Inc.                          HACHETTE BOOK GROUP USA, INC.

By: _____                  By: _____

Title: _____PRESIDENT_____                      Title: ___C.O.O.___

# EXHIBIT D

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.



**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | F |

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATI

_____  _____  _____
Month        Day      Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**A**

Title of Work ▼
The Shack

Registration Number of the Basic Registration ▼
TX 6-578-498

Year of Basic Registration ▼
2007

Name(s) of Author(s) ▼
William P. Young

Name(s) of Copyright Claimant(s) ▼
William P. Young

**B**

Location and Nature of Incorrect Information in Basic Registration ▼

Line Number _____  Line Heading or Description _____

Incorrect Information as It Appears in Basic Registration ▼

Corrected Information ▼

Explanation of Correction ▼

**C**

Location and Nature of Information in Basic Registration to be Amplified ▼

Line Number 2 _____  Line Heading or Description Name and Address of Author and Owner of the ©

Amplified Information and Explanation of Information ▼

Brad Cummings and Wayne Jacobsen, U.S. citizens, are co-authors with William P. Young——names were
omitted from basic registration. The copyright should thus be registered in the names of William P. Young, Brad
Cummings and Wayne Jacobsen as co-authors and co-owners of the work.

MORE ON BACK ▶   • Complete all applicable spaces (D-G) on the reverse side of this page.    DO NOT WRITE H
• See detailed instructions.   • Sign the form at Space F.

FORM CA RE.        ED                                                    FORM C

FUNDS RECEIVED DATE

EXAMINED BY                                                        FOR
                                                                  COPYRIC
CORRESPONDENCE ☐                                                   OFFICE
                                                                  USE
REFERENCE TO THIS REGISTRATION ADDED TO                           ONLY
BASIC REGISTRATION    ☐ YES ☐ NO

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

Continuation of: ☐ Part B *or* ☐ Part C

Correspondence: Give name and address to which correspondence about this application should be sent.

Martin D. Singer, Esq.
Lavely & Singer Professional Corporation
2049 Century Park East, Suite 2400, Los Angeles, California 90067

Phone (  310) 556-3501            Fax (  310) 556-3615            Email  mdsinger@lavelysinger.com

Deposit Account: If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name

Account Number

**Certification\*** I, the undersigned, hereby certify that I am the: (Check only one)
☐ author
☐ other copyright claimant        ☐ owner of exclusive right(s)
                                  ☒ duly authorized agent of   Brad Cummings & Wayne Jacobsen
                                                               Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼  Martin D. Singer                     Date ▼  March 11, 2010

Handwritten signature (X) ▼

Certificate     Name ▼
will be          Martin D. Singer
mailed in       Number/Street/Apt ▼
window
envelope         2049 Century Park East, Suite 2400
to this          City/State/ZIP ▼
address:         Los Angeles, California 90067-2906

**YOU MUST:**
· Complete all necessary spaces
· Sign your application in Space F
**SEND ALL ELEMENTS
IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or
   money order payable to *Register of
   Copyrights*
**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

\*17 *USC* §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.



# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.



Register of Copyrights, United States of America

**Short Form TX**
For a Nonexclusive Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER
**TX 6-578-498**

Effective Date of Registration
5/11/07

Examined By: MAY 11 2007
Deposit Received: MAY 11 2007

TYPE OR PRINT IN BLACK INK. DO NOT WRITE ABOVE THIS LINE.

**1 Title of This Work:**
THE SHACK

Alternative title or title of larger work in which this work was published:

**2 Name and Address of Author and Owner of the Copyright:**
WILLIAM P. YOUNG
221 NW 12TH ST
GRESHAM, OR 97030

Nationality or domicile:
Phone, fax, and email.
Phone ( 503 ) 501-7980   Fax ( 503 ) 723-0967
Email wpy@msn.com

**3 Year of Creation:**
2007

**4 If work has been published, Date and Nation of Publication:**
a. Date: MAY (Month) 1 (Day) 2007 (Year)
b. Nation: U.S.A.

**5 Type of Authorship in This Work:**
Check all that the author created.
☑ Text (includes fiction, nonfiction, poetry, computer programs, etc.)
☐ Illustrations
☐ Photographs
☐ Compilation of terms or data

**6 Signature:**
Registration cannot be completed without a signature.
X _____   WINDBLOWN MEDIA
☐ Author   ☐ Authorized agent

**7 Name and Address of Person to Contact for Rights and Permissions:**
☐ Check here if same as #2 above.
BRAD CUMMINGS / WINDBLOWN MEDIA
4680 CALLE NORTE
NEWBURY PARK, CA 91320
Phone ( 805 ) 498-2466   Fax ( 805 ) 491-1260
Email office@windblownmedia.com

**8**
Name: BRAD CUMMINGS / WINDBLOWN MEDIA
Number/Street/Apt: 4680 CALLE NORTE
City/State/Zip: NEWBURY PARK, CA 91320

**9 Deposit Account:**

# Continuation Sheet
# for Application Forms

Form ___/CON
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| PA | PAU | SE | SEG | SEU | SR | SRU | TX | TXU | VA | VAU |
|----|-----|----|----|----|----|----|----|----|----|----|

EFFECTIVE DATE OF REGISTRATION

(Month) (Day) (Year)

CONTINUATION SHEET RECEIVED

Page ____ of ____ pages

- This Continuation Sheet is used in conjunction with Forms CA, PA, SE, SR, TX, and VA only.
  Indicate which basic form you are continuing in the space in the upper right-hand corner.
- Try to fit the information called for into the spaces provided on the basic form.
- If you do not have enough space for all the information you need to give on the basic form, use this Continuation Sheet and submit it with the basic form.
- If you submit this Continuation Sheet, clip (do not tape or staple) it to the basic form and fold the two together before submitting them.
- Space A of this sheet is intended to identify the basic application.
  Space B is a continuation of space 2 on the basic application.
  Space B is not applicable to Short Forms.
  Space C (on the reverse side of this sheet) is for the continuation of Spaces 1, 4, or 6 on the basic application or for the continuation of Space 1 on any of the three Short Forms PA, TX, or VA.

DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY.

---

**A**
Identification
of
Application

IDENTIFICATION OF CONTINUATION SHEET: This sheet is a continuation of the application for copyright registration on the basic form submitted for the following work:
- TITLE: Give the title as given under the heading "Title of this Work" in space 1 of the basic form.

THE SHACK

- NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S): Give the name and address of at least one copyright claimant as given in space 4 of the basic form or space 2 of any of the Short Forms PA, TX, or VA.

WILLIAM P. YOUNG

---

**B**
Continuation
of Space

NAME OF AUTHOR ▼

WILLIAM P. YOUNG

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

5/11/1955

d   Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ CANADA
{ Domiciled in ▶ BECHTRRUR OR USA

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed ▼

NOVEL / FICTION

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

e   Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed ▼

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

f   Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed ▼

---

Use the reverse side of this sheet if you need more space for continuation of Spaces 1, 4, or 6 of the basic form or for the continuation of Space 1 on any of the three Short Forms PA, TX, or VA.

**PROOF OF SERVICE**
1013A(3) C.C.P. Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 2049 Century Park East, Suite 2400, Los Angeles, California 90067.

    On the date listed below, I served the foregoing document described as:

**FIRST AMENDED COMPLAINT FOR:**

**(1) DECLARATORY RELIEF UNDER 17 U.S.C. §§ 101, *ET SEQ.*; AND  (2)BREACH OF CONTRACT**

**DEMAND FOR JURY TRIAL**

on the interested parties in this action by placing:
    **[X] a true and correct copy -OR- [ ] the original document**
thereof enclosed in sealed envelopes addressed as follows:

**SEE ATTACHED SERVICE LIST**

**[X]  BY MAIL:**
    [ ]    I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.
    [X]    As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**[ ]  VIA E-MAIL**
    [ ]    As follows: I e-mailed a copy of the above-described document to each of the e-mail addresses below using Adobe Acrobat.

**[ ]  VIA PERSONAL SERVICE:**
    [ ]    I delivered said document to the offices of the addressee(s), via hand delivery.

    I declare that I am duly employed in the office of a member of the bar of this Court at whose direction the service was made. Executed **June 22, 2010**, at Los Angeles, California.

_____
MAYRA L. VERA

FAC (D) 062210.wpd

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SERVICE LIST

WAYNE JACOBSEN, et al., v. WILLIAM PAUL YOUNG
USDC CASE NO.  CV 10-3246 JFW (JCx)

Michael T. Anderson, Esq.
Donald A. Miller, Esq.
LOEB & LOEB LLP
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, California 90067-4164
Telephone: (310) 282-2000
Facsimile: (310) 282-2200
Email:      manderson@loeb.com
            dmiller@loeb.com

Attorneys for Plaintiff and Cross-Defendant
*WILLIAM PAUL YOUNG*

Richard Kendall, Esq.
Phil Kelly, Esq.
KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA  90067
Telephone:  (310) 556-2700
Facsimile:  (310) 556-2705
Email:      rkendall@kbkfirm.com
            pkelly@kbkfirm.com

Attorneys for Plaintiff-in-Interpleader
*HACHETTE BOOK GROUP, INC.*

FAC (D) 062210.wpd

20